The final case to be heard this morning is 24-7069 United States v. Bycroft. Counsel for appellant, if you'd make your appearance and proceed. May it please the court. My name is Howard Pincus from the Federal Public Defender and I represent Heather Bycroft. Ms. Bycroft was convicted of producing and possessing child pornography on the theory that she was the person who filmed a video at a pool party of a six-year-old girl whose shorts and underwear were being manipulated to expose her genitalia. The district court wrongly admitted under Rule 404b proof that Ms. Bycroft later took peeping tom upskirting videos of adult women. This court should vacate her convictions. For other acts' evidence to be admissible, they have to be relevant to a proper purpose. This court has repeatedly stressed that the linchpin of Rule 404b relevancy is similarity. Here, the pool and upskirting videos differ in two important and obvious ways that make them very dissimilar. The first difference, of course, is that the pool video is of a six-year-old girl and the upskirting videos are of adult women. The district court considered both videos to be illicit, and they were, but a sexual interest in young children is unusual and abnormal. Proof that someone has an interest in the private areas of adult women does nothing to prove that he or she... But she's not being charged with sexual interest in young children. She's being charged with taking these photographs. It could be that it was her husband, she said, who kept pressing her to do these things. Well, she said he kept pressing her to do the upskirting videos years later after they were married. The point here, though, is what does the upskirting videos tell us about her intent or a common scheme or plan or absence of mistake or accident? Well, one of the things of 404 is identity. So apart from anything else, if it meets, helps show identity, that satisfies 404. And isn't that indeed the issue here? Who was the person that took the first camera film? Yes, who took the video at the pool. So wasn't it just squarely into identity? Well, the district court said it went into identity because you could see her face and hear her voice on the upskirt videos. Well, actually in the the testimony is about that, but the upskirting videos that were introduced at trial don't show that. But even so, there's no claim that you could see anything about the operator of the camera at the pool. You can't see whoever was recording at the pool at all. You can hear a voice. You could hear a hum in the actual video that is the subject of the child pornography. You can hear in other pool videos that may or may not be been taken by Ms. Bycroft, which she denied that she took them. But if the jury could potentially have found that, the court could have admitted the upskirting video audio perhaps to allow a comparison of her voice. But there could be no comparison of her face because her face wasn't on any of the recordings at the pool. Did everybody stipulate that it was her voice on the various recordings? Not at all. Okay, so they needed her face to identify the voice, didn't they? Didn't they need to prove to the jury that the voice on the upskirting videos was hers? They could have admitted if that were essential, they could have admitted parts of it that don't show what was the upskirting aspect of it. But it doesn't allow you to bring in other acts evidence under that could be easily excised as this court held in United States v. Kelly. So, but basically what the district court did was assume what had to be proved, which was she was the operator of the video at the pool, and therefore her face was relevant because it showed that it was her. Well, that's the whole point of the trial. The face on the peeping Tom videos would have matched, it would have been synced with the voice that was heard. And you said, and it is true that on the pool video, there's only the voice. Now, one thing I want to get clear is, as I understand it, when the court instructed the jury on proper purpose, it was mistake or accident, it was identity, and it was this common scheme or plan. Correct. Well, the jury could have wasn't it critical that they be able to know, be able to infer that it was Ms. Bycroft at the pool? In other words, to be able to make the link between her face and the voice, because you said there's an, uh-huh, well, there was three, what, four people who testified as to whether her voice was Ms. Bycroft. Well, why not? Well, there were five when you include Ms. Bycroft. When you include Ms. Bycroft. Thank you for the clarification. So, as it relates to that, I guess the point I'm getting at, and I'll try to be concise here, is it seems to me one of the proper purposes that was before the jury related to whether Ms. Bycroft would have engaged in a mistake or accident in doing the pool videos. Isn't it relevant in that context to know that it was Ms. Bycroft who actually did the peeping Tom videos, and she did not tell us that until she was on the stand? And so, wouldn't it have been important to know that it was Ms. Bycroft who did the peeping Tom videos, and the only way we would really know that is to link her face to her voice? Well, mistake or accident requires a similarity. If there's disparate circumstances, as this Court held in Comanche, it negates any possibility of directly using the other act's evidence to prove lack of mistake or accident. And we have upskirting videos of adult women, voyeuristic conduct. That's a world apart from filming a little girl whose genitalia are being exposed. It doesn't tell you anything about mistake or accident in that context because the two are so dissimilar. I got the dissimilar point, but I guess what I'm trying to drill down on is the point of in bolstering the case for mistake or accident, isn't it important to know that the peeping Tom video person is actually Ms. Bycroft? Only if the peeping Tom videos would go to show lack of the proper purpose at play is mistake or accident. I want to show that it is Ms. Bycroft in the peeping Tom videos to bolster mistake or accident. And then you say, well, whoa, whoa, whoa. It doesn't really matter because they are dissimilar. But the point I'm getting at is in terms of under abuse of discretion standard, the theory that it is important to link those two, face, voice, to bolster mistake or accident, why isn't that reasonable? Well, first of all, it wouldn't allow for, if you just want to link face and voice, you could have shown parts of it that didn't include the upskirting. The upskirting videos were... I mean, isn't that an issue of prejudice of whether some of the material is unnecessary or unduly prejudicial? We do the balancing test as opposed to permitted uses of other crimes and wrongs under 404. It might be both. I think fundamentally what it is, is that it doesn't show mistake or accident. And even if her face and had to be linked to her voice, there were ways to limit it that didn't show the other act's conduct. If we had done that, if we had done that, if the district court had excluded the peeping Tom video and just shown her face and her voice, you would have been here saying that that was irrelevant, that it had no... What was the value of that? Well, the value of it is to show... It wouldn't have been linked in any way to any... If you're saying you have... Just hearing the voice, we don't know who that person is. She... I'm sure she would have stipulated that it was her voice on those videos, but all that would have allowed is playing... She didn't. Nobody asked her to. They tried to admit it on these other three theories. And also, if it's admitted on identity itself, the fact that it could have been admitted on other grounds, which it can't be, wouldn't matter because the jury would have been allowed to consider it for identity purposes. But the dissimilarity of the two contexts, somebody who films, records a voyeuristic conduct of adult women, to say that that person is somebody who would film a six-year-old girl whose genitals are being exposed by the manipulation of her clothing is just a world apart. They're not at all comparable. You talk about those as two different subjects. I'm curious if you have any case law that's factually on point because they both involve surreptitious videoing. They both involve women or female gender. They both involve trying to take pictures of genitalia. I mean, so sure, they're not precise in every area, but I don't see them as this great divide of one of them is Mount Everest and the other is showing a birthday party kind of stuff. Well, I mean, we cited a number of cases in our opening brief about how a sexual interest in adult women doesn't translate to a sexual interest in child. In our reply brief, we cited Holly versus Yarborough from the Ninth Circuit, 568 F. 3rd, 1091, which makes the same point. And I think it would shock most people to say, well, because you're willing to take a voyeuristic video, that's similar in some meaningful way to taking a child pornography. Well, they're both voyeuristic, aren't they? Well, one is... I mean, they're both surreptitiously taking a photograph of female genitalia. They are, but the difference is between adult female genitalia. Well, first of all, in the upskirt videos, there's no actual female genitalia. Well, I mean, yeah, but I mean, you don't... They weren't taking upskirt videos to try to see nothing. No, they were trying to see something. Yes. So let me ask you this about our recent Summers case. Are you familiar with that one? I'm not. It's August 1, so it's really new. But it was a case where Judge Timkovich wrote the opinion, and it's looking at modus operandi 404B evidence, and one of them came... One case, the prior case where they were taking the MO was a sex abuse case, and the case being prosecuted was a child pornography case. I mean, those are really different subject matters. Well, was it a child sex abuse case? There was a child sex abuse case. And child pornography. Right. There's something with children in both of those cases. Here, we have adults and children. We have something with surreptitious videoing of genitalia in both of these. Well, and certainly, Mr. Bycroft is doing both. The question is, who is with him the first time? And of course, early in their relationship, the notion that you would jump into record child pornography seems to be a big stretch. But there's just not a similarity here. People who are interested in adult pornography are not necessarily... That fact alone doesn't tell you anything about whether they're interested in child pornography. Of course, some are interested in both. But what the issue here is, is what was done with respect to adult women, does it tell you anything about what was done with a child, a six-year-old girl? This goes back to Judge Evel's point. I mean, she's not on trial for having curious interests in child pornography. That's not what's at issue here. There are multiple reasons why she could have taken those videos. I mean, they could have taken those videos so that they could put them on the internet, which they may well have intended to do. Either one of those could have been that purpose. The fact of the matter is, you have two, allegedly, and that's what they're trying to prove, two people who have the same activity that they engage in. And by same activity, I mean trying to take pictures of someone's genitalia. And no one doesn't have to say, well, I don't like genitalia of children. I mean, that's not the point. Who cares? I mean, if you're doing it for a reason quite apart from your period interest in it, what difference does it make? If they were taking surreptitious pictures of something that wasn't female genitalia, adult genitalia, in another context, you wouldn't try to translate that to this context. No, I wouldn't. But it seems to me what we're talking about is the same object. But no, the object is very different. The object is adult women in one case and children in another. It's seeing what is otherwise hidden in one case and the act of manipulation to expose a young girl in another case. So they're just very different. And there's nothing unique. I'm sorry. No. Well, you spent a lot of time in here and oral argument and certainly in your briefs about these being different subjects. If we were to disagree with you on that, if we were to say that the sexual content of both, the female gender issue of both, and the photographing of both is enough, at that point, do you lose or do you have other arguments? No, because on identity, what would really have to be present here is a signature quality, something which clearly shows that she was the same, that whoever recorded, that the obscuring videos were done in such a unique way that it marked her as necessarily the recorder of what happened at the pool. I was intrigued by that phrase in your briefing. Signature quality is not something that usually pops up in the cases I'm familiar with. That implies that there's something unique about the crime. Ninety-five percent of the crimes that we have up here have no signature quality. They are sale of drugs, no signature quality. They're an act of revenge or a gang thing. And we don't admit those on identity, typically. Signature quality is just an odd characteristic to add to the complexity. Well, it's certainly what's reflected in this court's case law on 404B, when you're looking for identity. When it's there, it bolsters the case, but I don't know that it has to be there. I just am not aware of it. I mean, this court, in the cases we saw in the brief, say there has to be a distinctive quality that's unique enough to create a strong inference that the person in event A is the same person as in event B. And the unique quality is photographing of somebody's genitalia. But the word signature quality is generally associated with the modus operandi, proper purpose. It's not identity. And those two things aren't the same thing. Do you disagree with that? No, but the modus operandi helps show the identity of the person doing it. Yes, but those are two, just three proper purposes, right? Well, it could be used to show identity here, for example, through her voice, which is on both. That's a permissible use of identity. It doesn't require a modus operandi. But in this, the way it is here, leaving aside her voice, which we agree could have been played for the jury if the court had limited it, but it didn't, what it did do was present other act evidence to show that she was necessarily the same person because she did it in the same way. I guess the point that I want to drill down on is identity and modus operandi are separate proper purposes under Rule 404B, right? Yes, but I think modus operandi shows who is doing the crime. And it shows a signature identity. And that line of authority relates to modus operandi. It doesn't relate to identity per se, does it? I think it does here, yes. What case do you have that says it's required that there be a signature quality to prove identity under 404B? I don't have it off the top of my head, but we cite it in our briefs, those cases. Okay, fine. Thank you. Thank you. Good morning again, Your Honors. Lisa Williams, representing the United States of America. The dispute in this appeal boils down to the weight that the defense gives to these two different types of filming. And he argues, in writing and today, that they're just too disparate to be similar enough to fall under 404B. The district court disagreed. And I don't think that this court can find that that's an abuse of discretion because there's just simply no clear error of judgment, and it doesn't exceed the bounds of permissible choice. For the exact same reasons that Your Honors identified already, that these are surreptitiously filmed videos of women's genitalia. And I would add that they're also done in public or semi-public settings as well. The dressing rooms are public. The pool's a public party. And so those factors are sufficient to make them so similar that they were properly omitted under 404B. Did the government propose any other form of evidence to reach the same... I don't mean to reach the same result, but to have the same effect, like Mr. Pincus was talking about, just using audio, or maybe the jury could have just been told that there was some surreptitious upskirting or... I don't recall a stipulation or a limiting proposal like that in the record. And I was a trial counsel, so... Right. And I'm not saying you had to do it. I'm just curious if there was any... If you view it as any... Was there any other way to do this that could have been less prejudicial? You know, if the videos only spoke to her voice, and that's the reason they were being omitted, then I think just omitting the audio from the Peeping Tom videos would have been less prejudicial. But those videos don't just speak to her voice. I mean, it is really significant that she goes out in public with her husband, and they make secret videos. Because this is not a sexual interest case.  The M.O. I mean, they work together with a common scheme or plan to make these videos. And we don't, you know, we hear a lot, oh, sexual interests and kids and adults. First of all, that argument is completely belied by the fact that Jason Bycroft, the co-defendant, is involved in both of these videos. Well, that's presuming that she's involved in both of the videos, and that's the question we need to decide, right? Correct, but counsel stood up here and said, oh, you know, people who are interested in child porn aren't interested in adult porn. Well, Jason Bycroft sure is, because he pled guilty, and he admitted his involvement with the Upskirt videos. So we know at least one guy out there is interested in both child and adult porn pornography. As it relates to this modus operandi theory, which the district court did not rely on, the idea there that modus operandi could turn on the same third party being involved in both offenses, do you have any authority that supports that? I don't, Your Honor. I do think it speaks to the common scheme or plan which the district court did find on, that the two of them together, husband and wife, have a common scheme and plan to film certifished videos together. And that would imply that these two events, the one in 2015 and the one in 2017 or so, or 2018, were joined together in, this was our thing, this is what we did as a common scheme or plan. I'm sort of troubled to find that to be right, and if that is not right, let me just skip ahead from the merits question of whether that's right or not. Let's assume that I were to find that that proper purpose was infirm, okay? That, in other words, the court was wrong to allow the jury to consider that purpose. What I want to know from you is what is the implication of that? Because you have an instruction that allowed a jury to consider three purposes, and I'm positing, just as an assumption, that one of the three is wrong. What is the implication of that? I think the easiest implication is to run it under the harmless error analysis, that if it was wrong, it's still coming in under those other two permissible prongs, and the jury would still be able to see it, and therefore, the chances of a different verdict under harmless error are not, defendant hasn't met his burden to prove that. I do want to mention, I think it is confusing, or the record's less than clear when these videos were, in fact, made, because there were several videos, and the district court limited the government to three videos out of the upskirt videos, and I would just note that the PSR notes that there were videos made in September of 2015, which is just a few months after this, October of 2015 and January of 2016. Those are the Plato's Closet video series. But those videos aren't at issue here. We're talking about the Peeping Tom videos. No, those are Peeping Tom videos, Your Honor. I think it's less than clear from the record, this whole universe of videos, if any of the Plato's Closet videos were admitted at trial. The record's less than clear about which videos of this whole, because there were a lot of Peeping Tom videos. And to distill some of the prejudice, the district court said, you only get three. Okay. I'm only going to let you admit three of the Peeping Tom videos. And you're telling me that there is no, we have no certainty as to what the date range was? I mean, what we heard, I think, from one witness, it may, I may have been the defendant herself, but we heard from one witness, that it would have been 2017, 2018 on the Peeping Tom videos. And some of the videos were from that time frame as well, Your Honor, absolutely. And that may be one, I tried to go through before this oral argument and nailed down which three, when each of the three videos were created. And I, unfortunately, could not piece that together with enough certainty to make a representation. Exhibit four was from this year, five was from this year, and exhibit six was from this year. And so theoretically, some of these videos, would they have all been after the charge video? Yes. All of the conduct takes place after the July 4th pool party. That's in 2015. So yes, all of these videos are subsequent, but some are only a few months subsequent. And I think even if those... Those were never put into evidence at all. We have no evidence about these other videos at all. Is that right? Well, but the jury didn't hear the evidence. Yeah, the jury didn't hear them. Could, can we consider them? I think that the court could consider them. When making the timing analysis of, are these similar in time? Are they remote in time? The court can consider whether or not the search of his videoing took place. Let me back up. Could I? Yeah. If I understood Judge Ebel's question, the issue was whether some of these peeping Tom videos would have been the ones that occurred in late 2015, 2016. And I understand from you that you cannot with certainty tell us the answer is no. That's correct. I can't without... But what I can tell you... That just leaves this agnostic then. Well, except here's the point I want to make on that. So when the district court is evaluating the peeping Tom videos under the 404B test and it's seen, is this course of conduct similar in time or is it in remote in time? I think it makes a difference if you have a whole series of conduct starting in 15 and continuing to 18. And you look at that and you say, oh, it's similar in time. It's close to time. So yeah, these videos are coming in. Now, government, you pick the three that you want. Whereas if the first video was from 2018, then you have to look at it and say, well, this is three years after the pool videos. It's less similar in time. And so when this court is evaluating whether the district court abused its discretion in evaluating that factor, I think it can consider the totality of the timing of the videos. Was the dissimilarity in timing argued by the defendant below? I don't know the answer to that, Your Honor. Did the government make an offer of proof on the videos that didn't come in? No, Your Honor. Okay. Um, but these also videos speak to one of the other proper processes. On your offer of proof response, you're not saying, however, or are you saying that the court was not aware that there were other videos post-July pool party and picked three? That's what I thought I heard you say. The court was, before we got to trial, yes. The court, my understanding is that there was a motion hearing. The government argued this. I think even provided all of the pool videos to the court. The court went back into chambers, reviewed the motions, looked at the videos, and then said, in its written order, I'm going to let you admit these, but not all of them. We're not, it's a waste of time. It's repetitive. You don't get all of them. So you can identify three that you would like. And so under that theory, the idea would be that in considering whether they were remote or closer in time, whether they might be speak a common scheme or plan that even though they were not admitted and presented to the jury as in making this evidentiary threshold determination, the court could consider the context in which the videos existed. Exactly, Your Honor. That's the government's argument with respect to these other videos. I'm just unclear what the evidentiary basis for that is. Are they in the record, but not submitted to the jury? Or are they not even in the record? And if not, except for just saying, well, that's what counsel said, so that's good enough for us. How can we rely on the basis for your argument? They certainly were never submitted to the jury. Only three videos went to the jury. Whether they are in the record, it does not appear that the videos were filed as exhibits to the motion to suppress hearing. So I don't have them to provide to the court in that sense. But the transcript of the motion to suppress hearing does indicate that the court received the exhibits, the videos, and would go back and watch them. And the transcript identifies some of the date ranges of these videos? No, Your Honor. The date ranges are then identified in the PSR in paragraph 15. And was there an objection to that? And there's no objection to that. So that's, okay. That's, sorry, it took me a while to find it too, Your Honor. But yes, it is unobjected to facts in the PSR, paragraph 15. That's how I know those dates is from the PSR. Poor Mr. Pincus is back there scratching his head. I also do want to speak to another proper purchase, which is mistake or accident, right? And it's particularly present in this case. Because when FBI first talks to Ms. Bycroft about the upskirt videos, she says, oh my gosh, that was a mistake. Sometimes my phone just goes off by accident and I guess it accidentally records things. So of course, going into trial, the government does not know her defense. She's entered the general denial, not guilty plea. And of course, the government is prepared for a mistake or accident offense, which is, I was filming at the pool and we thought it was a happy time. I thought Jason was going to throw her up in the air and do a flip and then all of a sudden, this happens. Well, no, you didn't. Because you two go out together and you surreptitiously film videos of women's genitalia. You weren't mistaken. You knew what he was going to do. And that speaks directly also to her knowledge that she was going to be manufacturing and producing. Wasn't there also some video on the first one that tends to support it? She said, I got it or something like that. Are you ready? She asked him if he's ready. Yes. So there are some words that also address that it wasn't a mistake within the videos itself. But more is always better in terms of evidence for the government, Your Honor. More evidence is usually better. And this mistake statement, was that relating to the pool video or to the Peeping Tom video? That was to the Peeping Tom video. Okay, got it. The FBI interviewed her about those.  And she said, oh, my phone just goes off in the dressing rooms. So as I mentioned, this court only needs to find that one of the 404B purposes is proper in this case. And if the other two, there was some issue with them, then I think that would fall under the harmless error analysis, which in this case, there is a lot of strong evidence. You have three people who know Ms. Bycroft fairly well. Her mother-in-law, sister-in-law, and a family friend, saying that it's her voice on the video. You also have the fact that, I mean, who else, right? Like in a way, like there's some different evidence on the size of this party. I think 20 is the low end and maybe 60 people are at the party. It is a big party. But like who goes and films child porn with another guy at a pool party other than someone who knows him, such as his wife? So- Don't ask me. Don't ask me. Your Honor, it's funny. I teach at the law school and I was telling my students about this argument and I told them, if you're ever on a date and at the pool party and you're a date, ask you to start filming. The date ends. I said, you need to walk away from that date. But it doesn't make sense, right? I mean, there's this intuitive sense that we all get that of course it has to be his wife. And that speaks to the weight of the evidence as well. Well, at that time, it wasn't his wife, right? In the pool video. You are correct. He was not married at the time of the pool video. They did get married after that. And I see my time has expired. And so unless there are other questions from the bench, the government would rest on its briefs. Thank you. One minute, Mr. Pincus. At the pool party, there was no proof that there was anything that the camera was hidden or the recording device was hidden. In fact, it was clearly aimed at the person, unlike with the upskirt videos where it was put under a skirt. So the notion that this was done where nobody could see what was going on is false. There was a potential to be seen. Of course, nobody wants to be seen committing a crime. But that doesn't make anything unique. It's not our burden to show harm. I think opposing counsel was saying we haven't met our burden to show harmlessness. And again, on identity, there's nothing here from the upskirting videos that itself would show she was the one recording the pool videos, other than a modus operandi that would say these two were necessarily doing the same kind of thing. Well, the voice. And that would require the uniqueness. The voice. The voice shows that she was doing the... And we've conceded the voice could have been omitted for a comparison purpose. I'm talking about, apart from that, to actually show the conduct in the upskirting videos. That's what's improper. It's not like using a particular car at one place and you know that if the car was at the other place, it must be the same person. There's no such distinctive link here. It would have to be modus operandi that would show identity. And that would require a signature quality. Thank you. Thank you, counsel. The case is submitted. And we will be...